IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 16, 2003 Session

## CHARLES LARRY HONEYCUTT v. ANN MARIE MIGLIACCIO HONEYCUTT

**A Direct Appeal from the Chancery Court for Shelby County**
**No. D-26994-2     The Honorable Arnold Goldin, Chancellor**

---

**No. W2003-00233-COA-R3-CV - Filed December 12, 2003**

---

This appeal involves the interpretation of an MDA incorporated into a Final Decree of Divorce concerning a provision for termination of alimony upon wife's cohabitation with an unrelated male. The trial court denied Husband's petition for termination and Husband appeals. We reverse and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Jerry A. Schatz, Memphis, For Appellant, Charles Larry Honeycutt

Stevan L. Black and Vickie Hardy Jones, Memphis, For Ann Marie Migliaccio Honeycutt

**OPINION**

Plaintiff, Charles Larry Honeycutt ("Husband" or "Plaintiff"), and defendant, Ann Marie Migliaccio Honeycutt ("Wife" or "Defendant"), were divorced on February 9, 1998 after nearly 32 years of marriage. Husband filed a Complaint for Absolute Divorce on March 18, 1996, on the grounds of irreconcilable differences. Husband's complaint requested the court to dissolve the parties' marriage and "approve the Marital Dissolution Agreement which Plaintiff anticipates the parties will enter into." Wife filed an Answer and Counter-Complaint for an Absolute Divorce on April 25, 1996, admitting the existence of irreconcilable differences and alleging, as further grounds for divorce, Husband's inappropriate marital conduct. Wife's Counter-Complaint sought, in part, an equitable division of the marital assets, alimony pendente lite and permanent alimony, and reasonable attorney's fees.

By Order entered January 2, 1997, the trial court directed Husband to pay Wife "$1,000.00 per week as alimony pendente lite, beginning June 1, 1996, until further Court Order." The court additionally ordered Husband to pay Wife $1,200.00 for attorney's fees incurred during the hearing on her motion for alimony pendente lite.

A Marital Dissolution Agreement ("MDA") was filed on January 9, 1999. The parties' agreement specified, *inter alia*, that Husband would pay to Wife $1,000.00 per week in alimony *in futuro*, "until such time as Wife dies, remarries, cohabitates with a man not related to her, reaches the age of 65, or becomes qualified to receive Social Security benefits, whichever occurs first." The parties further clarified that "Husband's obligation to pay alimony shall cease upon the occurrence of any of those events."

The MDA provided that Husband would pay, as additional alimony *in futuro*, "the premium on Wife's major medical health insurance until such time as Wife remarries, cohabitates with a man not related to her, reaches the age of 65, becomes eligible for Medicare benefits, or until either party dies, whichever occurs first." With regard to attorney's fees incurred, the agreement specified that "Husband shall pay, as alimony, directly to Wife's attorney, Barbara McCullough, $2,500.00 for the purposes of defraying Wife's attorney fees."

The Court entered a Final Decree of Absolute Divorce on February 9, 1998, terminating the parties' union on the grounds of irreconcilable differences and, incorporating by reference, the MDA. On May 23, 2001, Husband filed a Motion to Divorce Referee for termination of his alimony obligations. This same day, Husband filed a "Petition to Modify Final Decree of Divorce To Terminate Alimony." As grounds for his petition, Husband alleged that Wife was cohabitating with an unrelated male, "with whom she is romantically involved," both at his residence in Tampa, Florida, and her Cordova, Tennessee home. Wife filed an Answer to Husband's petition on January 24, 2002, addressing Husband's allegation of cohabitation:

> Denied. Respondent has been involved in a dating relationship with a male person who resides in Tampa, Florida. She has spent the night at his home in Tampa, Florida on a number of occasions. Likewise, on a few occasions this male person has spent the night at her home in Cordova, Tennessee located at 8686 Cedar Farms. At all times Respondent has maintained a separate residence and is not receiving support from this male person nor is she providing any support to this male person. Each of the parties is self-supporting.

On August 14, 2002, Wife filed a "Petition for Scire Facias and Citation for Civil and Criminal Contempt, to Reduce Arrearage to Judgment, and for Attorneys' Fees." Wife's petition alleged that Husband regularly failed to pay alimony as required by the parties' MDA since entry of the Final Decree of Divorce and, specifically, had failed to pay alimony and Wife's health insurance premium since July 12, 2002.

In response to a motion filed by Wife requesting a continuance of the hearing scheduled for Husband's petition, a special chancellor entered an Order on August 28, 2002 resetting the hearing and further directing:

> It further appearing to the Court that the alimony payments of $1,000.00 per week that Petitioner was previously ordered to pay pursuant to the terms of the Marital Dissolution Agreement entered in this cause shall be suspended as of August 14, 2002 until the hearing herein. Such suspended payments will be due and payable to Defendant in the event that alimony previously awarded to her is not terminated at the hearing.

Wife next filed a "Motion to Reinstate Alimony Payments Pending Hearing on Mr. Honeycutt's "Petition to Modify Final Decree of Divorce to Terminate Alimony"" on October 4, 2002, asserting that the protracted litigation was causing her to deplete her already limited financial assets. The trial court granted Wife's motion for reinstatement of alimony by Order entered October 18, 2002, concluding that the alimony payments required of Husband pursuant to the parties' MDA should be reinstated, and further directing Husband to "pay to Ms. Honeycutt promptly all payments which have accrued since the date of the suspension of Mr. Honeycutt's obligation."

On November 1, 2002, Wife filed a second "Petition for Scire Facias and Citation for Civil and Criminal Contempt, to Reduce Arrearage to Judgment, and for Attorneys' Fees," citing Husband's continued and repeated failure to comply with the alimony requirements set forth in the MDA. Shortly thereafter, Husband filed a Motion to Dismiss Wife's petition of August 14, 2002. As grounds for his motion, Husband stated:

> Respondent states and alleges that no alimony payments have been due to Petitioner under the terms of the Marital Dissolution Agreement since at least October, 1999, as Petitioner has been cohabitating with a man not related to her since October, 1999, or before. Likewise, Respondent has not been obligated to pay the premium on Petitioner's health insurance since at least October 1999, for the same reason.
>
> Respondent further states and alleges that at the time the Petition for Scire Facias was filed, August 14, 2002, Respondent was current on all alimony payments he would have been obligated to make had his obligation not already ceased as a result of Petitioner's cohabitation with an unrelated male.

Husband's Motion to Dismiss Wife's November 1, 2002 petition, cited identical grounds in support.

A non-jury trial in this case was held on November 13 and 14, 2002. During her testimony at trial, Wife admitted to beginning a long-distance romantic relationship with Mr. Vern Barclay ("Barclay") in August 1999. At the time, Wife lived in Cordova, Tennessee, and Barclay resided in Tampa, Florida. The parties entered a stipulated calender as collective exhibits 1, 2, and 3 at trial, the calendars indicating that Wife spent approximately 266 days, from October 1999 through September 2000, at Barclay's residence in Tampa. Wife testified that she stayed at Barclay's home while in Tampa, and admitted that she engaged in sexual relations with Barclay and slept in his bed. Wife further acknowledged that when she was in Tampa, she always stayed at Barclay's home.

Throughout her testimony, Wife characterized her trips and extended stays in Tampa as "visits," and repeatedly denied cohabitating with Barclay.[1] The evidence is undisputed, however, that Wife had a key to Barclay's home, was free to stay there even when Barclay was not around, and kept several articles of clothing at the Tampa residence. Wife testified that she never paid any monies to Barclay for rent or utilities with regard to his Tampa home. The evidence is further undisputed that all of Wife and Barclay's Florida friends knew that the two were a couple.

Despite her frequent and prolonged "visits" to Florida, Wife testified that she maintained a home in Cordova, Tennessee.[2] Wife testified that she continues to pay taxes, insurance, and maintenance expenses on her Cordova home. Wife additionally noted that she has maintained utility service in her home, including telephone and internet service. Wife's income tax returns for the years 1999, 2000, and 2001 list her address as Cordova, Tennessee.

Wife also testified that she maintains her primary personal checking account with Union Planters Bank in Memphis, Tennessee. In further regard to her financial interests and assets, Wife testified that she opened a Morgan Stanley account in Florida, transferred a Payne-Webber security account from Memphis to Florida, and opened a personal account with Nations Bank in Florida. All of these accounts listed Wife's address as Barclay's Tampa residence.

_____

[1] Wife further explained her frequent and extended visits to Florida were necessitated by her involvement in a placement service business that she owned with Barclay. Wife testified that she was the Director of a corporation known as Legal Staff & More, and noted that she made her initial investment into this corporation in July 1999. The corporation, which began in Clearwater, Florida, was run out of Barclay's home in Tampa. Legal Staff & More ceased operation in October or November 2001, and Wife and Barclay closed the books on this business in January 2002.

[2] Wife testified that she put her Cordova home up for sale in February 2000, for a period of six months. Wife explained the reason for putting her home up for sale as she had plans to build a home in Tampa.

In an Order entered November 22, 2002, the court denied Husband's "Petition to Modify Final Decree of Divorce to Terminate Alimony." The court's order further denied the parties' individual requests for attorney's fees. Husband filed a Notice of Appeal on December 3, 2002.[3]

Husband presents as his sole issue for review the question of whether the trial court erred in denying his "Petition to Modify Final Decree of Divorce to Terminate Alimony," where Wife has continued to cohabitate with an unrelated male, thereby triggering the alimony termination conditions set forth in the parties' MDA. Wife presents for review the following additional issues, as stated in her brief:

> Whether the trial court erred in denying [Wife's] request for attorney fees incurred in defending her right to receive alimony from [Husband].

> Whether [Wife] should be awarded her attorney fees incurred in defending this appeal.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## I.

Husband's sole issue for review asks this Court to consider whether the trial court erred in denying his "Petition to Modify Final Decree of Divorce to Terminate Alimony," in light of Wife's cohabitation with Barclay.

The parties' MDA states, in pertinent part:

> 7. <u>Alimony</u>. As support and maintenance, Husband agrees to pay alimony <u>in futuro</u> to Wife in the amount of $1,000.00 per week ***until such time as Wife dies, remarries, cohabitates with a man not related to her, reaches the age of 65, or becomes qualified to receive Social Security benefits, whichever occurs first.*** The parties agree that under no circumstances shall Wife seek alimony in excess of that provided for in this Agreement, either in amount or duration. Husband's obligation to pay alimony shall cease upon the occurrence

---

[3] This Court denied a motion of Husband to expedite the decision in the present matter by Order entered June 5, 2003.

of any of those events. The parties acknowledge that this alimony is taxable to Wife and deductible by Husband.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

9. As further alimony in futuro, Husband agrees to pay the premium on Wife's major medical health insurance *until such time as Wife remarries, cohabitates with a man not related to her, reaches the age of 65, becomes eligible for Medicare benefits, or until either party dies, whichever occurs first.*

(emphasis added).

"An MDA is a contract and as such generally is subject to the rules governing construction of contracts." *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (citations omitted). "Since the interpretation of a contract is a matter of law, our review is *de novo* on the record with no presumption of correctness in the trial court's conclusions of law." *Witham v. Witham*, No. W2000-00732-COA-R3-CV, 2001 WL 846067, at * 3 (Tenn. Ct. App. July 24, 2001) (citing *Union Planters Nat'l Bank v. American Home Assurance Co.*, 865 S.W.2d 907, 912 (Tenn. Ct. App. 1993)).

In *Pitt v. Tyree Organization Ltd.*, 90 S.W.3d 244 (Tenn. Ct. App. 2002), we discuss the rules concerning construction of a contract:

> The cardinal rule in the construction of contracts is to ascertain the intent of the parties. *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999)(citing *West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310 (Tenn. Ct. App. 1984)). If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. *Id*. (citing *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955)). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Id.* (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975)). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Id*. (citing *Ballard v. North American Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983)). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Id*. (citing *Sutton v. First Nat. Bank of Crossville*, 620 S.W.2d 526 (Tenn. Ct. App. 1981)). Courts cannot make contracts for parties but can only enforce the contract which the parties

themselves have made. *Id*. (citing *McKee v. Continental Ins. Co.*, 234 S.W.2d 830 (Tenn. 1951)).

*Id.* at 252.

In *Heyer-Jordan & Associates v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990), this Court stated that "in the absence of fraud or mistake, a contract must be interpreted and enforced as written, even though it contains terms which may be thought harsh and unjust." *See Petty v. Sloan*, 277 S.W.2d 355, 359 (Tenn. 1955).

In interpreting the parties' MDA, the trial court found the term "cohabitates with a man not related to her," ambiguous, and further determined that, in light of the language utilized in MDA paragraph 7 regarding alimony, this term should be read in conjunction with the other conditions listed for termination of alimony *in futuro*. Moreover, the trial court interpreted the parties' intent with regard to the alimony *in futuro* paragraph as requiring proof of support from a third party before termination of Husband's alimony obligations was triggered or permitted. We quote at length from the court's ruling from the bench on November 14, 2002:

> I think in looking at it, I have to make a determination in light of what the purpose of the agreement was, not just the agreement itself, because I think the language does have an ambiguity to it. There is certainly no definition for what this means.
>
> I think that one side may have one opinion about what the term "cohabitate" means, and the other side might have a different opinion. We could probably spend the rest of the day here arguing what it is.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> I don't think we can just pull that one section out of there which says, "... cohabitates with a man not related to her..." and not look at what these other statements say to determine what that term, "... cohabitates with a man not related to her..." means.
>
> I think when we look at these other statements, my interpretation of that is, and the purpose for which this alimony paragraph was put into the agreement was as support and maintenance until such time as an event occurs for which she would no longer require support and maintenance.
>
> In this case, those events would be: When the wife dies she would no longer require support and maintenance.

When she remarries she would no longer require support and maintenance.

When she reaches the age of 65 or becomes qualified to receive Social Security benefits she would no longer require support and maintenance, or when she becomes qualified to receive Social Security benefits, whichever occurs first.

Now, what does the term, "cohabitates with a man not related to her..." mean in the context of those events?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I think in light of what the purpose of Paragraph 7 of the agreement was, which was as support and maintenance for the lady. And in seeing her tax returns, that is essentially her whole support and income, which I think was the intention of the parties when this agreement was entered into.

I just don't think that I can pull out this part of the agreement that says, "... cohabitates with a man not related to her..." simply because she is having a relationship with someone – be it a sexual relationship or otherwise – unless I have proof that that person is providing her support.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I think in the context of these statements within Paragraph 7, that was the intent of this paragraph. The intent of this paragraph was for an event to occur that would no longer require Mrs. Honeycutt to require the alimony as support and maintenance that was agreed to in this agreement. That is the way I interpret, "... cohabitates with a man not related to her..."

I interpret that to mean not merely that she is visiting a man, staying with a man who she is having a sexual relationship with, but it has to go beyond that. It has to be that this person, in fact, is providing her support so that this alimony that she is provided under this agreement is no longer necessary.

So based on my interpretation of the agreement to mean that, and based on the fact that I have not heard any facts to support that

Mrs. Honeycutt is, in fact, receiving financial assistance from Mr. Barclay, I deny the petition.

"Cohabit" is defined as:

> 1: to live together as or as if as husband and wife (~ ed without formal marriage[;] 2a: to live together or in company[;] b: to be intimately together or in company[.]

*Webster's Third New International Dictionary* 440 (1993). Another definition for "cohabitation" reads:

> To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations.[4]

*Black's Law Dictionary* 236 (5th ed. 1979).

On the basis of the above-cited definitions for "cohabit" and "cohabitation," we conclude that these terms, as applied and utilized in common usage, do not require or necessarily include the receipt of financial assistance from or by a cohabitor. Moreover, from our reading of the plain language of the MDA, paragraph 7, we find no suggestion or requirement that Wife must receive financial assistance or support from an "unrelated male" with whom she is cohabitating, to allow for or trigger termination of Husband's alimony obligations.[5] We respectfully disagree with the trial court that the purpose of the cohabitation language is for Wife's support. To the contrary, Husband explicitly provided for termination of his support in the event of alternative areas of support. However, Husband did not attach "support" as a condition of cohabitating without benefit of marriage. It

[4] "Cohabitation" is more succinctly defined in the pocket edition of *Black's Law Dictionary* as, "[t]he fact or state of living together, [especially] as partners in life, [usually] with the suggestion of sexual relations." *Black's Law Dictionary* 107 (pocket ed. 1996).

[5] Wife asserts that T.C.A. § 36-5-101(a)(3)(A) and (B) (Supp. 2003) are applicable in this matter, as it involves a former spouse receiving alimony *in futuro*. Accordingly, Wife contends that the rebuttable presumptions listed in subsections (3)(A) and (3)(B) regarding the contribution of financial support to, or receipt of said support from, a third person with whom the alimony recipient is living, must be considered. As such, Wife asserts that there is no evidence in the record to indicate that Wife is contributing support to, or receiving support from, Barclay. Further, Wife maintains that the money that she receives from Husband in the form of alimony *in futuro* is her primary means of financial support, and that she still has a need for such support.

In this particular case, we find T.C.A. § 36-5-101(a)(3)(A) and (B) inapplicable. This is a case of contract interpretation. Our review is governed by the plain language of the parties' MDA. The MDA does not reference, cite, or incorporate this statute with regard to suspension or termination of Husband's alimony obligations. Rather, the MDA explicitly provides for the termination of these obligations upon Wife's death, remarriage, cohabitation with an unrelated male, her becoming qualified for receipt of Social Security benefits, or her reaching age 65, "whichever occurs first."

appears to the Court that Husband was not adverse to providing support for Wife, except when the enjoyment of the use of his money is shared with a paramour.

We further note that the parties freely chose to include in the MDA, as a condition for termination of alimony *in futuro*, Wife's "cohabit[ation] with a *man not related to her*." (emphasis added). If it was truly the intention of the parties to premise termination of Husband's alimony payments upon Wife's receipt of financial assistance from a cohabitor, we find no reason for the parties' to elect to explicitly terminate alimony upon cohabitation with an unrelated male, and not upon cohabitation with any third party, such as family members or girlfriends. That said, we find that the parties explicitly contracted for the termination of Husband's alimony obligations in the event Wife cohabits with an unrelated male, regardless of whether said male was providing Wife with financial assistance or support. We therefore find that the trial court erred in denying Husband's petition on the basis that he failed to introduce proof that Wife was receiving financial assistance from Barclay.

Having concluded that the language of the MDA requires or allows for termination of Husband's alimony obligations upon Wife's cohabitation with an unrelated male, we must now determine whether Wife in fact cohabited with Barclay as said term is defined in common, plain language. The evidence in this case is undisputed that Wife began an exclusive romantic relationship with Barclay in August 1999. The parties entered, as a collective exhibit, calendars for the years 1999, 2000, and 2001, to which Wife stipulated. According to the 1999 calender, Wife spent 41 consecutive days in Barclay's home from October 3, 1999 through November 13, 1999. The 2000 calender reveals that Wife stayed with Barclay in his Tampa home for 206 days during a period spanning January 2000 through September 2000. Collective Exhibit 3, the 2001 calender, indicates that Wife stayed in Barclay's Tampa home for 175 days from January 1, 2001 through September 8, 2001.[6] Additionally, Wife acknowledged that she and Barclay took several trips together, including vacations to New England, Europe, Disney World, Atlanta, Lake Tahoe, and

---

[6] Wife contends that her frequent and extended visitations in Tampa were primarily a result of her interest and involvement in Legal Staff & More. Wife further suggests that her visits to Florida became less frequent after the business closed in late 2001, early 2002. We note that neither of the parties entered a calender for the months of October through December 2001, or for the year 2002.

Despite Wife's assertion, we find no evidence in the record to indicate that Wife's visits to Florida became more or less frequent after the closing of the aforementioned corporation. Point of fact, Wife testified that she continues to visit and stay with Barclay at his new Florida home "on a regular basis," stating:

Q. (BY MR. SCHATZ) You would agree, based on that information, that you are still continuing to stay in his residence, in his bedroom, sleeping with him, for long periods of time. Would that be a correct statement?

A. Yes.

North Carolina. Wife testified that she and Barclay took these trips as a couple, sharing hotel rooms or bedrooms.

Wife admits to engaging in sexual relations with Barclay during her "visits" to Tampa, and further acknowledges that while in Tampa, she always stayed with Barclay, and shared his bed. Wife testified that she kept clothing in the closets at Barclay's Tampa home, stating:

> Q. Okay. And now, again so we can be crystal clear on this, you kept clothing down at 4309[, Barclay's Tampa residence,] that just stayed there; am I correct?
>
> A. It depended on if I needed it in Memphis. I'm sure I left clothing behind, in all honesty.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> Q. (BY MR. SCHATZ) Is it in fact true that you kept a large amount of clothes, including underwear, down at [Barclay's Tampa home]?
>
> A. I have clothes and underwear. I have clothes in Tampa.
>
> Q. In fact, isn't it so many that you have at least a large part of the closet in the bedroom that you share with Mr. Barclay?
>
> A. A large part of it?
>
> Q. Yes, of the closet.
>
> A. No.
>
> Q. Okay. And is it true that you also have clothes on a hanging rack or have had clothes on a hanging rack because it [sic] wasn't room in the bedroom for all of your clothes? Isn't that true?
>
> A. I had a rack, yes.
>
> Q. That was in addition to the clothes that you kept in the bedroom closet, is that true?
>
> A. I have quite a few clothes there.
>
> Q. Okay.

> A. I mean, I wouldn't say that I have more than two suitcases
> full of clothes.

In addition to clothing, Wife also admitted to keeping toiletries at Barclay's home, although she insisted that she normally "took all my toiletries back and forth [from Memphis to Tampa]." Wife further conceded that she kept her automobile in Tampa from January 1, 2001 through September or October 2001. The evidence is moreover undisputed that Wife had a key to Barclay's home, and would have had free run of the home even on occasions when Barclay was away.

There is no evidence in the record to indicate that Wife paid rent or utilities during her stay in Barclay's home, nor is there any evidence that Barclay provided her with financial support. Wife acknowledged that she and Barclay both contributed to the purchase of groceries and toiletries.

When questioned as to whether she and Barclay held themselves out as a couple to friends and acquaintances in Florida, Wife testified:

> Q. Were there any other – or can you remember any instances
> where you held yourself out or represented to third parties that you
> and Mr. Barclay were a couple?
>
> A. All of our friends knew we were a couple.
> Is that what you're asking me, sir?

The evidence additionally indicates that Wife had her mail forwarded to Barclay's Tampa residence for an extended period of time in 2000. Further, during examination by Husband's counsel at trial, Wife acknowledged that she had given an answer during an earlier deposition admitting that she had, on at least one occasion, represented her address as Barclay's Tampa home.

In light of these facts, we find that the evidence in the record establishes that Wife cohabited with Barclay at his Tampa home. *Cf. Harris v. Corley*, No. 01-A-019102CH00055, 1991 WL 119061, at *1-2 (Tenn. Ct. App. July 5, 1991) (holding that facts justified application of T.C.A. § 36-5-101(a)(3) where proof was entered that alleged cohabitant spent several nights at plaintiff's home, kept toiletries and clothing at plaintiff's residence, had a key to the residence, used plaintiff's telephone number in advertisements for boats, trucks, and trailers that he was attempting to sell, and where plaintiff and cohabitant gave each other "money as needed"); *Azbill v. Azbill*, 661 S.W.2d 682, 686-87 (Tenn. Ct. App. 1983) (concluding that it could not find that the evidence preponderated against the trial court's finding that plaintiff and alleged cohabitant were living together within the meaning of T.C.A. § 36-820(a)(3) where record indicates that cohabitant was at plaintiff's home daily, "had a key, came in and out as he pleased, had clothes and toilet articles in the house, and at least on four different occasions spent the entire night in the home," and where trial court was in better position to determine the credibility of the witnesses); *but cf. McCullough v. McCullough*,

No. 01A01-9701-CV-00039, 1997 WL 749459, at *4 (Tenn. Ct. App. Dec. 5, 1997) (finding of court that evidence "does not preponderate in favor of a finding of cohabitation where third party's overnight visits were sporadic, and where there was "no evidence that [the third party] kept clothing or toiletries at Wife's home, that he had a key to the home, or that he routinely ate his meals at Wife's home").

Having determined that Wife cohabited with Barclay, an unrelated male, we find that, under the plain language of the parties' MDA, Husband's alimony obligations are terminated. However, there must be a determination of when cohabitation occurs. As it is defined, cohabitation requires a "living with" arrangement, thus contemplating a continued course of conduct. Our Supreme Court in *Jones v. State*, 184 S.W.2d 167 (Tenn. 1944), considering the word "cohabit" stated:

> Independent of the use of the word continue, the word cohabit, standing alone, connotes a fixed, rather than a transient, condition. The term "cohabit," says 14 C.J.S., *Cohabit*, p. 1311, "imports a dwelling together for some period of time, and does not include mere visits or journeys. . . .

*Id.* at 169 (citations omitted).

In the instant case, the record establishes that at the very least Wife lived with Barclay in his Tampa home for 206 days from January 2000 through September 2000. There can certainly be no doubt that cohabitation occurred during this period of time. However, because of the continuing nature of the term "living with," some period must be established for the actual termination of the alimony obligation. Husband filed his petition to modify the final decree of divorce on May 23, 2001, alleging cohabitation in violation of the MDA. For lack of a better termination period, we believe that the date of filing the petition would be the proper date for the termination of Husband's obligation under the MDA.

Accordingly, on remand, the trial court is to determine alimony paid by Husband from and after May 23, 2001, and enter judgment against Wife for that amount as a refund to Husband.

In sum, the order of the trial court is reversed, and it is ordered that the obligation of Husband for alimony is terminated effective May 23, 2001. The case is remanded to the trial court for determination of the amount of alimony paid by Husband subsequent to May 23, 2001 for entry of judgment of that amount against Wife. Costs of the appeal are assessed to Appellee, Ann Marie Migliaccio Honeycutt. The remaining issues are pretermitted.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.