IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2019 Session

## DEBORAH LYNN MATHEWS v. DOUGLAS CLAY MATHEWS

**Appeal from the Circuit Court for Davidson County**
**No. 10D3341   Philip E. Smith, Judge**

_____

### No. M2018-01886-COA-R3-CV
_____

This is a post-divorce case involving a husband's petition to terminate his alimony obligation. Husband argued that the wife cohabited with a paramour, which, pursuant to the parties' MDA, terminated his alimony obligation. The trial court, however, found that wife and her paramour did not cohabit with one another and denied husband's petition. Additionally, the trial court denied wife's request for attorney's fees, finding that her increased income, combined with the alimony she was receiving from husband, allowed her to afford to pay her attorney's fees at trial. Wife and Husband raise separate issues on appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Larry Hayes, Jr., Nashville, Tennessee, for the appellant, Deborah Lynn Mathews.

John J. Hollins, Jr. and L.B. McCullum, Franklin, Tennessee, for the appellee, Douglas Clay Mathews.

### OPINION

#### BACKGROUND AND PROCEDURAL HISTORY

Deborah Mathews ("Wife") and Douglas Mathews ("Husband") divorced on May 18, 2011 after twenty-four years of marriage. The permanent parenting plan designated Wife as the primary residential parent of the parties' two minor children.[1] Pursuant to the parties' Marital Dissolution Agreement (the "MDA"), Husband was obligated to pay

---

[1] One of the parties' children had reached the age of majority at the time of the parties' divorce.

Wife alimony *in futuro* in the amount of $10,000 per month, which obligation would "automatically terminate upon death of either party, or remarriage or cohabitation with a paramour of Wife."[2]  The MDA also provided the following regarding future legal proceedings: "If either party *reasonably institutes legal proceedings to procure the enforcement of any provision of this agreement*, then he/she will also be entitled to a judgment for reasonable expenses, including attorney's fees and accountant fees, incurred in prosecuting the action." (emphasis added)  Further, pursuant to the MDA, Wife was awarded exclusive use of the marital home located at 907 Overton Lea Road (the "Overton Lea Home") until it was sold, at which time the parties were to equally divide the net proceeds of the sale.  Husband was also required to pay to Wife an additional $115,500 upon the sale of the Overton Lea Home.

In June 2012, Wife and Shannon Leroy—whom Wife had begun dating in April 2010—formed a general partnership for the purpose of purchasing a home located at 6117 Hickory Valley Road (the "Hickory Valley Home").  The partnership obtained a construction loan and used the funds from the loan, together with a separate contribution from Mr. Leroy, to purchase and renovate the Hickory Valley Home.[3]  According to Wife, she and Mr. Leroy anticipated two possible scenarios when forming the partnership: (1) Wife would use the proceeds from the sale of the Overton Lea Home to buy out Mr. Leroy's interest in their partnership; or (2) Wife and Mr. Leroy would renovate the Hickory Valley Home and then sell it for a profit.  The Overton Lea Home eventually sold in July 2013, but for more than $1 million less than anticipated.  Consequently, Wife was unable to buy out Mr. Leroy's interest.  As a result, they dissolved the partnership, conveyed ownership of the Hickory Valley Home to themselves, and entered into an ownership agreement.[4]  After the sale of the Overton Lea Home, Wife moved into the Hickory Valley Home.

On November 2, 2015, Husband filed a Petition to Terminate Alimony in the Davidson County Circuit Court (the "trial court"), asserting two bases: (1) Wife, since April 2010, had been in a romantic relationship and cohabited with Mr. Leroy, and (2) following their divorce, Wife's income had increased significantly, constituting a substantial and material change in circumstance.  On June 13, 2017, Husband filed an Amended Petition to Terminate Alimony and Petition to Modify Custody and Child Support.  Therein, he expounded upon the alleged increase in Wife's income since the parties' divorce and, additionally, requested that the trial court designate him as the primary residential parent of his minor daughter.  As to Wife's increased income,

---

[2] To secure his alimony obligations, the MDA also required Husband to maintain a life insurance policy in the amount of $2,000,000, payable to Wife.  This obligation would terminate if the alimony obligation terminated.

[3] According to Mr. Leroy, his plan was to facilitate Wife in buying the Hickory Valley Home by serving as a bridge loan.

[4] Wife and Mr. Leroy each purchased life insurance policies, naming each as the other's beneficiary in order to protect their respective interests in the Hickory Valley Home.

Husband provided the following numbers: "[Wife's] gross income has increased dramatically in recent years; 2011 – $1,038; 2012 – $99,573; 2013 – $187,000[;] and 2015 – $249,232." As to his request for a change in custody, Husband stated that, on or about April 1, 2017, the parties' youngest daughter had begun living with him on a full-time basis.[5] After the parties' daughter had moved in with him, Husband filed a Motion to Terminate Child Support and Set Child Support. On August 29, 2017, the trial court entered an order terminating Husband's child support obligation and reserving all issues related to Wife's child support obligation until the final hearing.

Husband and Wife attended a judicial settlement conference on January 8, 2018, during which Wife's counsel contended that Husband had failed to properly request a modification of his alimony obligation and, thus, could only seek a termination of his alimony obligation. Accordingly, Husband, on February 21, 2018, filed a Second Amended Petition, wherein he clarified that he was requesting either the termination of his alimony obligation or, in the alternative, a reduction of the obligation based upon the proof at trial.

On September 17, 2018, after a three-day trial, the trial court entered its Memorandum and Order, denying Husband's petition. With regard to Husband's assertion that Wife and Mr. Leroy cohabitated together, the trial court concluded that, while the parties' MDA provides that cohabitation automatically terminates alimony, the MDA failed to define what cohabitation meant. Additionally, the trial court found that, while Wife and Mr. Leroy had dinner together more often than not, traveled and attended social events together, celebrated some holidays and special occasions together, and professed their love for one another, it was undisputed that they spent only one to two nights per week together and that

> at all times until the Leroys married in December 2017, Mr. Leroy maintained his own home . . . . Mr. Leroy's driver's license, voter's registration and tax returns all reflected his Allen Place address. Mr. Leroy did not keep clothing, toiletries, medications or other personal items at [Wife's] home. Mr. Leroy had a key to [Wife's] home, but was not permitted unfettered access. The only clothing Mr. Leroy kept at Hickory Valley were some slippers and a t-shirt.

As to Husband's assertion that there had been a substantial and material change in circumstance based on Wife's increase in income, the trial court disagreed, noting that it was foreseeable—even expected—that Wife would attempt to generate income through her business following the parties' divorce. It concluded that, "[d]espite her increased business income since the parties' divorce, [Wife] continued to need alimony and

---

[5] The daughter's decision allegedly came as a result of Wife's ongoing relationship with Mr. Leroy and the amount of time Mr. Leroy spent at the Hickory Valley Home.

[Husband] continued to be able to pay." Lastly, the trial court concluded that, while Wife's increased business income did not constitute a material change in circumstances justifying the termination of her alimony award, it—combined with her alimony award—did allow her to afford to pay her own attorney's fees.[6]

### ISSUE PRESENTED

Wife raises only one issue on appeal: Whether the trial court erred in denying her request for attorney's fees when she prevailed in the underlying case brought by Husband and the parties' MDA provides for an award of such fees.

Husband raises one additional issue: Whether the trial court erred in finding that Wife did not cohabitate with Mr. Leroy prior to their marriage.

Both Husband and Wife seek their attorney's fees on appeal.

### STANDARD OF REVIEW

The Tennessee Supreme Court has set forth the standard of review appellate courts are to apply in cases involving the modification of alimony:

> Because modification of a spousal support award is "factually driven and calls for a careful balancing of numerous factors," *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989), a trial court's decision to modify support payments is given "wide latitude" within its range of discretion. *See Sannella v. Sannella*, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999). In particular, the question of "[w]hether there has been a sufficient showing of a substantial and material change of circumstances is in the sound discretion of the trial court." *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999) (citations omitted). Accordingly, "[a]ppellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998); *see also Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999) ("As a general matter, we are disinclined to alter a trial court's spousal support decision unless the court manifestly abused its discretion."). When the trial court has set forth its

---

[6] Although not pertinent to this appeal, the trial court also denied Husband's request to retroactively terminate his life insurance obligation. Additionally, because Husband had paid child support for April, May, June, and July of 2017—despite the fact that the parties' daughter had moved in with him April 1, 2017—the trial court ordered that Wife reimburse Husband for such expenses in the amount of $4,512. It also ordered that Wife pay Husband $9,720 for the remaining ten months—August 2017 to May 2018—at which point the parties' daughter reached the age of majority.

- 4 -

factual findings in the record, we will presume the correctness of these findings so long as the evidence does not preponderate against them. *See, e.g. Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000); *see also* Tenn. R. App. P. 13(d). *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). Additionally, we review the trial court's resolution of questions of law de novo with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

## DISCUSSION

## A. Cohabitation

We turn first to Husband's argument on appeal that the trial court erred in denying his petition to terminate his alimony obligation based upon its finding that Wife had not cohabited with Mr. Leroy.

Pursuant to the parties' MDA, Husband was obligated to pay Wife alimony *in futuro* in the amount of $10,000 per month, which obligation would "automatically terminate upon death of either party, or remarriage or cohabitation with a paramour of Wife." A marital dissolution agreement is a contract and is subject to the rules governing the construction of contracts. *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006). The interpretation of a contract is a matter of law, and our review of the trial court's decision regarding the enforcement of a contract is, therefore, de novo on the record with no presumption of correction as to the trial court's conclusions of law. *Id*. As the trial court correctly noted, although the parties' MDA specified cohabitation with a paramour of Wife as a ground for termination of Husband's alimony obligation, the term cohabitation is not defined in the MDA. The Tennessee Supreme Court was faced with a similar situation in *Honeycutt v. Honeycutt*, where the term cohabitation was not defined in the parties' MDA. *See Honeycutt v. Honeycutt*, 152 S.W.3d 556, 561-62 (Tenn. 2003). There, the Supreme Court set out to ascertain the plain, ordinary, and popular sense of that term:

"Cohabit" is defined as:

1: to live together as or as if as husband and wife (without formal marriage)[;]
2a: to live together or in company[;] b: to be intimately together or in company[.]

*Webster's Third New International Dictionary* 440 (1993).

Another definition for "cohabitation" reads:

> To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations.

> *Black's Law Dictionary* 236 (5th ed. 1979).

*Id.* at 563. Additionally, the *Honeycutt* Court quoted another Tennessee Supreme Court decision, which discussed the word "cohabit" as follows:

> Independent of the use of the word continue, the word cohabit, standing alone, connotes a fixed, rather than a transient, condition. The term "cohabit," says C.J.S., *Cohabit*, p. 1311, "imports a dwelling together for some period of time, and does not include mere visits or journeys" . . . .

*Id.* at 566 (quoting *Jones v. State*, 184 S.W.2d 167, 169 (Tenn. 1944)). This Court has reached a similar conclusion regarding the definition of "cohabitation." In *Mabee v. Mabee*, we concluded that

> the term cohabitation with another man requires more than an intimate or sexual relationship and more than spending the night on several occasions with another man. The term cohabitation with another man additionally requires something akin to the mutual assumption of duties and obligations that are customarily manifested by a married couple or life partners.

*Mabee v. Mabee*, No. M2012-02430-COA-R3-CV, 2013 WL 3355236, at *3 (Tenn. Ct. App. June 27, 2013).

Here, the record reflects that Wife began an exclusive romantic relationship with Mr. Leroy sometime in 2010. At trial, Wife testified that, following the divorce, Mr. Leroy spent the night anywhere from one to two nights per week at the Overton Lea Home. Additionally, Wife testified that, after the Overton Lea Home sold—and before their marriage in December 2017—Mr. Leroy spent the night anywhere from one to three nights per week at the Hickory Valley Home. Mr. Leroy did not have a key to the Overton Lea Home, but he did have a key to the Hickory Valley Home; however, Wife testified that he could not come and go as he pleased. Additionally, the record reflects that Wife and Mr. Leroy took several trips together and that Mr. Leroy kept only a few articles of clothing and a toothbrush at the Hickory Valley Home. Based on the foregoing proof, Husband requests that this Court find that the trial court erred in its ruling that Wife and Mr. Leroy did not cohabit in such a manner as to warrant a termination of his alimony obligation, pursuant to the parties' MDA.

In *Honeycutt*, the Supreme Court terminated the husband's alimony obligations after determining that the wife had cohabited with an unrelated male. *Honeycutt*, 152 S.W.3d at 566. There, the record included three calendars for the years 1999, 2000, and 2001, which revealed the following:

> According to the 1999 calendar, Wife spent 41 consecutive days in Barclay's home from October 3, 1999 through November 13, 1999. The 2000 calendar reveals that Wife stayed with Barclay in his Tampa home for 206 days during a period spanning January 2000 through September 2000. Collective Exhibit 3, the 2001 calendar, indicates that Wife stayed in Barclay's Tampa home for 175 days from January 1, 2001 through September 8, 2001.

*Id*. at 564-65. The wife in *Honeycutt* admitted that she kept "quite a few clothes" at Mr. Barclay's home and that she kept her automobile there for nine consecutive months. *Id*. at 565. The wife also admitted that she opened a Morgan Stanley account in Florida, transferred a security account from Tennessee to Florida, and opened a personal account with Nations Bank in Florida, all of which listed her address as Mr. Barclay's Tampa residence. *Id*. at 560. Moreover, the Supreme Court found that "Wife had a key to Barclay's home, and would have had free run of the home even on occasions when Barclay was away." *Id*. at 565.

Although the issue in *Honeycutt* is the same as it is here, the facts are not. While the *Honeycutt* Court noted that, "at the very least Wife lived with Barclay in his Tampa home for 206 days" during a nine-month period, *Id*. at 566, here, Mr. Leroy—at most— spent significantly less time with Wife at the Overton Lea Home and the Hickory Valley Home during twelve-month periods.[7] Mr. Leroy kept only a pair of slippers and occasionally a spare, clean tee-shirt at Wife's homes,[8] and, while he did have a key to the Hickory Valley Home, he did not have unfettered access to it. Furthermore, the record reflects that Wife and Mr. Leroy maintained their own separate residences until they were married in December 2017, and there is no proof that Mr. Leroy ever listed Wife's

---

[7] According to Wife's testimony, Mr. Leroy spent the night anywhere from one to two nights per week at the Overton Lea Home and anywhere from one to three nights per week at the Hickory Valley Home, totaling 104 and 156 nights, respectively, in a twelve-month period.

[8] Specifically, Wife testified as follows:
> Q: Did Mr. Leroy have clothes hanging in your closet like I think of clothes in somebody's house?
> A: No.
> Q: Okay. Well, what clothing did he have if any?
> A: He kept a pair of old slippers at my house so that if after dinner we watched TV he had comfortable shoes . . . . He kept a toothbrush at my house. He brought over a T-shirt when we did—you know, I like to do flower beds and he would help me. So sometimes he would bring a T-shirt.

address as his own on his driver's license, voter's registration, tax returns, or bank accounts.

The facts presently before us are more analogous to those in *Mabee*, where this Court affirmed the trial court's conclusion that the former spouse had not cohabited with her paramour. *See Mabee*, 2013 WL 3355236, at *4. In so holding, we made similar distinctions to the facts in *Honeycutt*:

> The court noted that the ex-wife in *Honeycutt* spent 266 nights a year with her boyfriend[;] however, in this case the defendant typically spent two nights a week, which represents only 104 nights a year. The trial court also noted that none of the defendant's clothes were kept at Mr. Brown's residence, but that the ex-wife in *Honeycutt* kept many of her clothes at her boyfriend's home.

*Id.* at *3. Because the term cohabitation requires more than "spending the night on several occasions[,]" *id.*, and because the record reflects that Mr. Leroy kept a trivial amount of clothes at Wife's homes, did not have unfettered access to the Hickory Valley Home, maintained a separate residence from Wife until they married in December 2017, and never listed Wife's address as his own on his driver's license, voter's registration, tax returns, or bank accounts, we agree with the trial court's conclusion that Wife and Mr. Leroy did not cohabit with one another.[9]

Husband also argues that the trial court erred by "merging its analysis of cohabitation to include the separate, layered considerations required by the alimony statute" and, in doing so, "dismissed key evidentiary facts as being not pertinent to its considerations." Specifically, Husband argues on appeal that

> a distinction must be drawn because the language of [Tennessee Code Annotated section 36-5-121(f)(2)(B)] is not tantamount to the phrase "cohabitation with a paramour," which entails a broader analysis of the true nature of the relationship occurring between two (2) individuals in an intimate relationship and warrants consideration as to every aspect of the relationship.

While we agree with Husband's assertion that the alimony statutes are not applicable where parties have agreed in an MDA to terms different from those set out in

---

[9] As Husband notes in his brief on appeal, Mr. Leroy did make what he intended to be a bridge loan to Wife so that she could purchase the Hickory Valley Home, and he and Wife did travel and attend social events together throughout their relationship. This proof, however, is not enough to negate the substantial amount of other proof supporting the trial court's finding—and our conclusion—that Mr. Leroy and Wife did not cohabit with one another.

the statutes, *see Honeycutt*, 152 S.W.3d at 564,[10] after our review of the trial court's order, we conclude that the trial court did not base its decision on an analysis of the issue of cohabitation under Tennessee Code Annotated section 36-5-121(f)(2)(B). At the beginning of its order, the trial court noted that the parties' MDA did not define the term "cohabitation." Accordingly, it set out to "ascertain the plain, ordinary and popular sense" of the term. *Mabee*, 2013 WL 3355236, at *3. In doing so, the trial court merely found the language of the statute to be "instructive." In addition to its discussion of Tennessee Code Annotated section 36-5-121(f)(2)(B), the trial court—as Husband admits in his brief on appeal—provided definitions of "cohabitation" from seven different sources and discussed the findings of fact and conclusions of law from seven other cases in its attempt to ascertain the meaning of "cohabitation" as set forth in the parties' MDA[11] In doing so, the trial court considered the amount of days and nights Mr. Leroy spent with Wife, how often they ate and traveled together, the particular articles of clothing, toiletries, and medications Mr. Leroy kept at Wife's homes, the type of access Mr. Leroy enjoyed to Wife's homes, as well as several other pertinent considerations. To the extent Husband is arguing that the trial court did not consider enough aspects of Wife and Mr. Leroy's relationship in its determination of whether Wife and Mr. Leroy cohabited with one another, we disagree. Accordingly, we affirm the judgment of the trial court with respect to this issue.

## B. Attorney's Fees

We turn next to Wife's argument on appeal that the trial court erred in denying her request for attorney's fees. According to Wife, she is entitled to such an award because she prevailed at trial and because the parties' MDA provides for such an award. Additionally, Wife argues that the "only reason given by the trial court for failing to award [Wife] her attorneys' fees is not supported by this record."

In support of her argument, Wife cites to the following language in the trial court's order:

> Additionally, the trial of this matter was delayed from its original setting and additional legal fees were incurred due to [Wife] and Mr. Leroy's

---

[10] The *Honeycutt* Court stated the following:

> In this particular case, we find T.C.A. § 36-5-101(a)(3)(A) and (B) inapplicable. This is a case of contract interpretation. Our review is governed by the plain language of the parties' MDA. The MDA does not reference, cite, or incorporate this statute with regard to suspension or termination of Husband's alimony obligations.

> *Id.*

[11] There does not appear to be any reason why the parties could not have attempted to craft a definition of cohabitation and included it in their MDA, but they apparently chose not to do so.

obstinance regarding discovery and refusal to disclose certain financial records relevant to the issues in this matter. With these considerations in mind, the Court exercises its discretion to deny [Wife's] request for attorney's fees.

Wife, however, neglects the following language, which immediately precedes the previous quotation:

In this case, the Court has found that Ms. Leroy's increased income did not constitute a substantial and material change in circumstances justifying the termination of her alimony award. The Court does find, however, that her increased income—combined with the alimony she was receiving from Dr. Mathews—allowed her to afford to pay her attorney's fees in this matter.

As the Tennessee Supreme Court has stated, "a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion." *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). We conclude that the trial court did not abuse its discretion in declining to award Wife her attorney's fees.

Moreover, the language in the parties' MDA provides that "[i]f either party reasonably institutes legal proceedings to procure the enforcement of any provision of this agreement, then he/she will also be entitled to a judgment for reasonable expenses, including attorney's and account fees, incurred in prosecuting this action." Our courts long have observed that parties are contractually entitled to recover their reasonable attorney's fees when they have an agreement that provides the prevailing or defending party in a litigation is entitled to such fees. *See Lattimore v. Lattimore*, No. M2018-00557-COA-R3-CV, 2019 WL 1579846, at *11 (Tenn. Ct. App. Apr. 12, 2019) (emphasis in original). For example, in *Colley v. Colley*, the parties' marital dissolution agreement clearly provided for an award of attorney's fees to the prevailing party who instituted a legal action to enforce the MDA's provisions. *See Colley v. Colley*, No. M2014-02495-COA-R3-CV, 2016 WL 3633376, at *12 (Tenn. Ct. App. June 28, 2016). There, because we found that the mother was forced to file her petition seeking to modify the parenting plan, we concluded that she was entitled to an award of attorney's fees pursuant to the MDA. *Id.* "[I]f an agreement is valid and enforceable, it must be enforced as written regardless of whether the parties are before a trial court or an appellate court." *Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017). Here, however, contrary to Wife's argument on appeal, the plain language of the parties' MDA does not provide an award of attorney's fees for either the "prevailing party" or the "defending party," but rather only for the party who "reasonably institutes legal

proceedings to procure the enforcement" of the MDA. Because Wife did not institute the underlying proceedings, her argument must fail for this reason, as well.[12]

Finally, Husband and Wife each request their attorney's fees on appeal. Wife, however, made her request under a section in her brief titled "Relief Sought" and failed to raise such issue in her "Statement of the Issues" section, making no argument and citing no authority for such request. "Where a party makes no legal argument and cites no authority in support of a position, such issue is deemed to be waived and will not be considered on appeal." *Branum v. Akins*, 978 S.W.2d 554, 557, n.2 (Tenn. Ct. App. 1998). Additionally, "[c]ourts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). Accordingly, we deem Wife's request waived. As to Husband's request, an award of attorney's fees on appeal is a matter within this Court's sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). "When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case." *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). Here, Husband did not prevail on appeal and, therefore, his request for attorney's fees on appeal is denied.

---

[12] Our research has revealed just one other case that has considered this issue—namely, when a successful defending party has requested attorney's fees at the trial court level but the parties' MDA provides that only the party who *institutes* the action is entitled to such fees. In *Morgan v. Krauss*, a husband had filed a petition to modify his former wife's alimony obligation. *See Morgan v. Krauss*, No. M2014-02035-COA-R3-CV, 2015 WL 5936918 (Tenn. Ct. App. Oct. 12, 2015). On appeal, the wife argued that the trial court had erred by not granting her request for attorney's fees. *Id.* at *4. The parties' marital dissolution agreement, however, provided language similar to the provision before us regarding such fees: "In the event it becomes reasonably necessary for either party to institute legal proceedings to procure the enforcement of any provision of this Agreement, he or she shall also be entitled to a judgment for reasonable expenses, including attorney fees, incurred in prosecuting the action." *Id.* While we did not specifically note that it was the husband, rather than the wife, who had initiated the underlying legal proceedings, we concluded that the trial court did not abuse its discretion in finding "nothing in the parties' MDA requiring [the husband] to pay [the wife's] attorney's fees[.]" *Id.* Implicit in this holding is the underlying rationale that there was nothing in the parties' MDA requiring the husband to pay the wife's attorney's fees because it was the husband who had instituted the legal proceedings.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is hereby affirmed.


_____

ARNOLD B. GOLDIN, JUDGE