IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 17, 2009 Session

**CHRISTOPHER EUGENE RICKMAN v. TRACY ANNA RICKMAN**

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-002402-02     Kay S. Robilio, Judge**

**No. W2008-01276-COA-R3-CV - Filed May 13, 2009**

In this appeal, we are asked to determine whether the trial court erred in finding that the phrase "taking up residence," as used in the parties' marital dissolution agreement, equated to cohabitation, and in finding that Wife did not cohabitate with an unrelated male in violation of such agreement. We are also asked to determine whether the trial court erred in finding no material change of circumstances warranting a modification of Husband's alimony obligation, and in denying Husband's motions to re-open and supplement proof and for a new trial, based on newly-discovered evidence. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Aubrey L. Brown, Jr., Memphis, TN, for Appellant

James O. Parker, Memphis, TN, for Appellee

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Christopher Eugene Rickman ("Husband" or "Appellant") and Tracy Anna Rickman ("Wife" or "Appellee") were divorced on May 2, 2003. At the time of the divorce, the parties had two minor children who have now attained the age of majority. The parties entered into a Marital Dissolution Agreement ("MDA") which awarded the 5,000 square foot marital residence ("Eastridge Cove") to Wife and provided that Husband would pay to Wife temporary and rehabilitative alimony in the following amounts: $5,143.00 for the month of May 2003; $7,000.00 per month from June 1, 2003, to December 31, 2007; and $3,500.00 per month from January 1, 2008, to December 31, 2009. As additional support to Wife, Husband agreed to pay for Wife's college education at Christian Brothers University and law school education, or another educational program "calculated to result in the award of a post-graduate or other certification."[1] Under the MDA, Husband's obligation to pay temporary and rehabilitative alimony terminated "upon the earlier to occur of Husband's death, Wife's death or remarriage, or upon Wife taking up residence with any male person, other than a blood relation, or upon any such male person taking up residence with Wife."

On March 2, 2007, Husband filed a Petition to Modify Final Decree of Divorce as to Alimony. He alleged four substantial and material changes in circumstances warranting termination, or alternatively, a reduction, in the alimony being paid by Husband to Wife: (1) that Wife had "taken up residence" with an unrelated male, Robert Cosenza;[2] (2) that Wife's needs had decreased; (3) that Wife's income had increased; and (4) that Wife had completed her education and rehabilitation.[3]

Subsequently, on June 8, 2007, Husband filed an Application for Temporary Injunction and for Suspension of Alimony Payments asking the court to suspend his alimony obligation and to essentially freeze several of Wife's accounts in order that she would have funds available to repay Husband should the court retroactively modify his obligation. In a June 18, 2007 Order the trial court declined to suspend Husband's alimony obligation, but enjoined Wife from utilizing the funds held in a Certificate of Deposit with World Savings Bank. Additionally, the trial court set the issues for an expedited hearing on July 23, 2007.

According to Wife, Husband's counsel asked for and received a continuance on July 23, 2007, because Husband had not yet received responses to his requests for Mr. Cosenza's financial

---

[1] Under the MDA, Husband's obligation was limited to tuition, fees, books, supplies, and other charges assessed directly by the institution. A financial cap was placed on Husband's required contribution, as well as an end date of May 2007. Additionally, Husband's obligation terminated if Wife failed to remain enrolled as a full-time student in good standing, summer included. According to Wife, Husband stopped paying her tuition in the spring of 2004 because he believed she was no longer a full-time student. On appeal, Wife does not seek reimbursement for tuition expenses.

[2] Wife admits that she and Mr. Cosenza began a sexual relationship prior to the parties' divorce, which has continued since the divorce. She states that Husband cited the relationship as grounds for his divorce action.

[3] On appeal, Husband raises only grounds one and three as warranting modification of alimony.

records.[4]  The hearing was reset for September, but then moved to October 22, 2007, due to scheduling conflicts.

On October 22 and October 24, 2007, a hearing was held concerning Husband's petition. At the hearing, Wife testified as to her living arrangements.  She stated that after the parties' divorce in 2003, she moved into Eastridge Cove and remained living there until August 2005, when she moved to Auburn, Alabama, to pursue a doctoral degree.  Wife further testified that she leased an apartment in Auburn from August 2005 to May 2006, and she provided copies of cancelled rent checks for that period.  Wife testified that she returned to Eastridge Cove for summer break from May to August of 2006, when Eastridge Cove was sold.  In August 2006, Wife returned to Auburn where she rented a portion of her professor's home.[5]  Cancelled rent checks to Wife's professor were introduced for the period of August 2006 to January 2007.  In January 2007, Wife returned to Memphis, where she leased a townhome on Sawmill Creek Lane from January 20, 2007 to January 31, 2008.

Mr. Cosenza also testified at the hearing concerning his living arrangements.  Mr. Cosenza stated that he moved into the Vineyards Apartments in Germantown in 2003 and lived there until August 2005.  He conceded that while he lived at the Vineyards Apartments, Wife spent the night with him "every so often[,]" but he claimed she did not keep clothing or toiletries there.  He also testified that between 2003 and August 2005, he did not keep clothing or toiletries at Eastridge Cove and did not have a key to Eastridge Cove, where Wife was living.

At the hearing, Mr. Cosenza testified that he moved in to Eastridge Cove in August 2005, after Wife had moved to Auburn.[6]  He claimed that he paid Wife $1050.00 monthly as rent for the first floor suite, which included a bedroom and bathroom, as well as pool and kitchen access.  At the hearing, Wife introduced carbon copies of checks and bank statements evidencing monthly payments of approximately $1050.00 by Mr. Cosenza for the months of September 2005 through May 2006.[7] Mr. Cosenza also explained that because Wife's son was also living at Eastridge Cove, he did not

---

[4]  Wife claims that although Mr. Cosenza did not bring all of the financial documents to his deposition, as required by the subpoena duces tecum, "he agreed to voluntarily execute the necessary documents to allow Counsel for Appellant to obtain the missing records."  It is unclear whether the continuance was based on the non-receipt of documents from the companies or from Mr. Cosenza, himself.

[5]  In her deposition Wife explained that her professor left Auburn University for a sabbatical at St. Joseph's University in Philadelphia, Pennsylvania; however, he and his wife returned to their home in Auburn on some weekends.

[6]  In his deposition, on July 20, 2007, Mr. Cosenza testified that he moved in to Eastridge Cove in May or June of 2005.  However, at the hearing, on October 24, 2007,  he explained that the information he gave in his deposition was incorrect, as at the deposition he had just completed seven months of chemotherapy treatment which affected his ability to recall information.  The Transcript of Deposition of Robert A. Cosenza dated July 20, 2007, was designated as an additional portion of the record by Husband on August 28, 2008.

[7]  The April 2006 check was written for $1175.00.  Mr. Cosenza testified that the check covered April as well as "a piece of the month of May."

have free reign of the house, and that the portion he did not rent was "pretty much off limits." He further testified that he placed a lock on the door to his bedroom to which Wife did not have a key.

Finally, Mr. Cosenza testified that he remained living at Eastridge Cove until May 13, 2006, when he leased an apartment at the Arbors of River Oaks in Memphis. At the hearing, he produced a copy of his lease agreement, dated May 11, 2006, showing a lease term of May 13, 2006 to April 12, 2007.[8] Mr. Cosenza extended that agreement and continued to live at the Arbors of River Oaks until October 12, 2007. However, at the hearing, Husband's counsel suggested that Mr. Cosenza continued to reside at Eastridge Cove during the summer of 2006, after Wife returned there. As evidence of his continued residency, Husband's counsel introduced Mr. Cosenza's change of address information submitted to the post office changing his address from Eastridge Cove to a post office box, effective August 10, 2006; statements from Mr. Cosenza's First South Credit Union account bearing Eastridge Cove as his address through October 31, 2006; Mr. Cosenza's Teachers' Credit Union Statement, bearing Eastridge Cove as his address through at least June 30, 2006; and Mr. Cosenza's AmSouth Bank statement bearing Eastridge Cove as his address through October 10, 2006. On cross-examination, Mr. Cosenza explained that he changed his address with AmSouth Bank prior to that time, and he said that Wife sold Eastridge Cove in August of 2006, and thus that he could not have been living there beyond that time.

At the hearing, Wife was questioned extensively concerning overnight stays with Mr. Cosenza both at Eastridge Cove and in Mr. Cosenza's apartments. Like Mr. Cosenza, Wife testified that while Mr. Cosenza lived at the Vineyards Apartments in Germantown–from 2003 to August 2005–she spent the night with him only "on rare occasion" and did not have a key to his apartment. Furthermore, she corroborated Mr. Cosenza's testimony that Mr. Cosenza moved in to Eastridge Cove in August of 2005 and moved out in May of 2006, prior to Wife's return to Eastridge Cove for the summer. She also corroborated his testimony concerning his stay at Eastridge Cove. Wife explained that she allowed Mr. Cosenza to rent a portion of Eastridge Cove in order that her son, who was attending college in Memphis, could remain in the home. In her deposition, Wife stated that Mr. Cosenza rented only the downstairs master suite, while her son resided upstairs.[9] Furthermore, she stated that she removed her belongings from the downstairs master suite which Mr. Cosenza occupied, and that he moved his own furniture into his portion of the home. At trial, she testified that Mr. Cosenza placed a lock on his bedroom door to which Wife had no key, and that he did not co-mingle his groceries with Wife's or Wife's son's groceries. She further stated that with the exception of Mr. Cosenza's renting a portion of Eastridge Cove, the two never had keys to each others' residences, never kept clothing or toiletries at each others' residences and never co-mingled funds to pay household expenses. Although Wife conceded that she returned to Eastridge Cove approximately once a month while Mr. Cosenza resided there, she contended that she did not share

---

[8] The record also contains a copy of Mr. Cosenza's pro-rated check to Arbors of River Oaks, dated May 11, 2006, for May 2006's rent.

[9] On August 28, 2008, Husband filed a Designation of Additional Portions of the Record Pursuant to Tennessee Rules of Appellate Procedure, Rule 24, in which he added to the record on appeal the transcript of the deposition of Tracy A. Rickman, dated July 20, 2007. ).

a bedroom with Mr. Cosenza, but instead slept in her room on the second floor, because her son was also in the house.

Wife was also questioned at length concerning trips she made with Mr. Cosenza. Wife stipulated that she and Mr. Cosenza took twenty trips together, totaling sixty-four days, over a period of four and a half years. Wife admitted that she and Mr. Cosenza shared a room and a bed during these trips. However, Wife pointed out that since her divorce in 2003, she had taken forty-five trips, totaling 131 days, without Mr. Cosenza.

At the conclusion of the hearing, the trial court took the petition under advisement.Subsequently, on November 21, 2007, before the trial court ruled on Husband's petition, Husband filed a Motion to Re-Open and Supplement Proof. A hearing was held on the motion on November 30, 2007, wherein Husband alleged that although he subpoenaed American Express and AT&T Universal (d/b/a "Citibank") for Mr. Cosenza's account statements before trial, he did not receive such until November 15, 2007 and November 26, 2007, respectively.[10] Husband claimed that the statements revealed that from August 2005 to May 2006 Mr. Cosenza spent seventy-eight days in Auburn, Alabama, while Wife was residing there. He also claimed that the statements revealed two additional trips by Wife and Mr. Cosenza: a four day trip to California, and a five day trip to Italy. On December 7, 2007, the trial court entered an Order denying Husband's motion.

On January 25, 2008, Husband filed a Second Motion to Re-Open and Supplement Proof. A hearing was held on the motion on February 8, 2008, where Husband claimed that he received additional documentation from Regions Bank on January 16, 2008, which allegedly showed that Mr. Cosenza resided at Eastridge Cove, along with Wife, during the summer of 2006. On March 3, 2008, the trial court entered an Order denying Husband's second motion.

On March 24, 2008, the trial court entered an Order Denying Petition to Modify Final Decree of Divorce as to Alimony, finding that "[t]he conduct of Defendant Tracy Anna Rickman . . . did not amount to cohabitation with a third-party male to whom she was not related[.]" Subsequently, on April 23, 2008, Husband filed a Motion for a New Trial, in which he re-alleged the grounds for his motions to re-open and supplement proof, and added as a ground that by interrupting his examination, the trial court "effectively prevented Counsel for Plaintiff from fully and thoroughly examining Robert Cosenza at trial." On June 5, 2008, the trial court entered an Order Denying Motion for a New Trial.

## II. ISSUES PRESENTED

---

[10] The record contains copies of subpoenas duces tecum to American Express and Citibank requesting by October 19, 2007, statements of the accounts owned by Mr. Cosenza from August 2005 to December 2006. However, we note that neither document bears the clerk's signature nor an issue date. Wife does not challenge the issuance of either subpoena.

Appellant has timely filed his notice of appeal and presents the following issues, slightly restated, for our review:

1.      Whether the trial court erred in denying Husband's Petition to Modify Final Decree of Divorce as to Alimony, finding Wife had not "tak[en] up residence" with an unrelated male in violation of the parties' MDA;

2.      Whether the trial court erred in denying Husband's Petition to Modify Final Decree of Divorce as to Alimony, finding no material and substantial change in circumstances warranting modification; and

3.      Whether the trial court erred in denying Husband's Motions to Re-Open and Supplement Proof and his Motion for a New Trial.

For the following reasons, we affirm the decision of the circuit court.

### III.   STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Associates*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. **Ganzevoort v. Russell**, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)). We accord great deference to a trial court's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary. **Wells v. Tenn. Bd. of Regents**, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV.   DISCUSSION

#### A.   *"Taking up Residence"*

On appeal, Husband asserts that the circuit court erred when it denied his Petition to Modify Final Decree of Divorce as to Alimony, finding that "the conduct of [Wife] did not amount to

cohabitation with a third-party male to whom she was not related[,]" and thus, that Wife did not violate the parties' MDA. As we noted above, the MDA provides that

> [t]he obligations of Husband created herein shall also terminate upon the earlier to occur of Husband's death, Wife's death or remarriage, or upon Wife taking up residence with any male person, other than a blood relation, or upon any such male person taking up residence with Wife.

On appeal, Husband offers two alternative arguments concerning the language of the MDA, which we address below.

### 1. Any Residence Owned by Wife

First, Husband contends that the phrase "taking up residence" does not equate to "cohabitation," and had the parties intended such they would have used the term "cohabitation" explicitly. He notes that "take up" is defined, in the *Merriam-Webster Thesaurus*, as "to take for one's own use (something originated by another)" and that "residence" is defined, in the *Merriam-Webster Dictionary*, as "the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn" as well as "a building used as a home: DWELLING[.]" Husband argues that utilizing the "common usage" of these words, the trial court was "required . . . to terminate [Wife's] alimony if the court found that at any time [Mr.] Cosenza took for his own use the home or abode originated by [Wife]." Essentially, Husband suggests that because Wife allowed Mr. Cosenza–a non-related male–to reside in the home she maintained as her permanent residence, the MDA was violated, regardless of whether the two resided in the home simultaneously.

"'An MDA is a contract and as such generally is subject to the rules governing construction of contracts.'" ***Honeycutt v. Honeycutt***, 152 S.W.3d 556, 561 (Tenn. Ct. App. 2003) (quoting *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001)). "'Since the interpretation of a contract is a matter of law, our review is *de novo* on the record with no presumption of correctness in the trial court's conclusions of law.'" ***Id.*** (quoting *Witham v. Witham*, No. W2000-00732-COA-R3-CV, 2001 WL 846067, at *3 (Tenn. Ct. App. July 24, 2001)).

"The cardinal rule in the construction of contracts is to ascertain the intent of the parties." ***Id.*** (citing *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999)). To ascertain the parties' intent, we first look to the plain meaning of the contract's language. ***Allstate Ins. Co. v. Watson***, 195 S.W.3d 609, 611 (Tenn. 2006) (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)). We construe each provision in light of the entire agreement, ***Kyle v. J.A. Fulmer Trust***, No. W2008-00220-COA-R3-CV, 2008 WL 5156306, at *4 (Tenn. Ct. App. Dec. 9, 2008) (citing *Buettner v. Buettner*, 183 S.W.3d 354, 359 (Tenn. Ct. App. 2005)), taking the language "in its plain, ordinary, and popular sense." ***Honeycutt***, 152 S.W.3d at 562 (citing *Bradson Mercantile, Inc.*, 1 S.W.3d at 652). If we find that language clear and unambiguous, the literal meaning controls. ***Id.*** (citing *Planters Gin Co.*, 78 S.W.3d at 890).

However, if the language is ambiguous, we must look beyond the literal interpretation of the language to determine the parties' intent. *Id.* (citing *Planters Gin Co.*, 78 S.W.3d at 890).

"Contractual language 'is ambiguous only when it is of uncertain meaning and may be fairly understood in more ways than one.'" *Id.* (citing *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). "A provision is not ambiguous simply because the parties interpret it differently." *Kyle,* 2008 WL 5156306, at *4 (citing *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.,* 160 S.W.3d 521, 526 (Tenn. 2005); *Cookeville Gynecology & Obstetrics, P.C. v. Se. Data Sys., Inc.,* 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994)).

Despite the parties' now differing interpretations of the phrase "taking up residence," we find that the language is not ambiguous, and thus give effect to the plain meaning of the language. We cannot agree with Husband that the language was intended to relieve Husband of his alimony obligation should Wife choose to rent her real property to an unrelated male, regardless of whether Wife resided there, too. We must note that adopting this interpretation would force a violation of the MDA should Wife choose to rent a residence owned by an unrelated male. Such an interpretation also ignores the parties' use of the word "with"; to violate the MDA, Wife must "tak[e] up residence *with*" an unrelated male–both Wife and the unrelated male must reside together. Given its context within a marital dissolution agreement, we find that the phrase "taking up residence" cannot fairly be interpreted to mean anything other than "cohabitation." Thus, the trial court did not err in finding that Wife did not violate the MDA simply by leasing her real property to an unrelated male.

### 2. Cohabitation

Alternatively, Husband argues that even if "taking up residence" means "cohabitation," Wife violated the MDA by cohabitating with Mr. Cosenza. As evidence of cohabitation, Husband points out that prior to moving in to Eastridge Cove, Mr. Cosenza rented an apartment to which Wife was authorized to have a key. He also claims that while Mr. Cosenza resided at Eastridge Cove, Wife returned there "no less than one weekend a month and for extended periods during every holiday[.]" Furthermore, Husband asserts that Mr. Cosenza did not actually move out of Eastridge Cove in May of 2006 when Wife returned, but instead that the two lived there together from May 2006 to August 2006. Husband alleges that Mr. Cosenza "ran out and rented an apartment" in May of 2006 "in an effort to maintain some appearance that [he and Wife] were not cohabitating[.]" Finally, as evidence of cohabitation, Husband cites to "numerous, extravagant and exotic vacations" taken by Wife and Mr. Cosenza "during which they would share a room and a bed and engage in sexual relations."

At trial, Wife admitted that she "on rare occasion" spent the night with Mr. Cosenza at his apartment prior to her moving to Auburn, Alabama. Both in her deposition and at trial, Wife also acknowledged that while she was a student at Auburn University, she, at times, returned to Memphis. From the record, we find approximately forty-four days during the nine-month period of September

2005 to May 2006, in which Wife returned to Eastridge Cove while Mr. Cosenza also resided there.[11] From the record, we also find approximately twenty-four days between November 21, 2006 and January 13, 2007, in which Wife returned to Memphis and resided with Mr. Cosenza in his Arbors of River Oaks apartment.[12] At trial, Wife stipulated to taking twenty trips, totaling sixty-four days, with Mr. Cosenza, during the period of May 2003 to October 2007. Wife conceded that she shared both a room and a bed with Mr. Cosenza during these trips, but insisted that the two shared expenses. Wife also pointed out that during the same four and half year period she took forty-five trips, totaling 131 nights, without Mr. Cosenza. Finally, Wife testified in her deposition that she and Mr. Cosenza have never dated exclusively, and that she has dated other men since her divorce from Husband.

In *Honeycutt v. Honeycutt*, 152 S.W.3d 556 (Tenn. Ct. App. 2003), this Court considered whether a wife "cohabitate[d] with a man not related to her" in violation of a marital dissolution agreement.[13] In that case, Wife asserted that she maintained her own home in Cordova, Tennessee; however, she stipulated to spending 41 consecutive days in the male's home in Florida, as well as 206 days in the male's home during a nine month period, 175 days during an eight month period, and several trips of unspecified length. *Id.* at 560, 564-65. Additionally, she admitted to sharing a bed and engaging in sexual relations with the male during these "visits," keeping clothing and toiletries in his home, having a key to his home, having "free run" of the home even when the male was absent, and contributing to the purchase of groceries and toiletries. *Id.* at 565. In finding that the wife cohabitated with the male, we noted that "cohabitation requires a 'living with' arrangement, thus contemplating a continued course of conduct." *Id.* at 566. We further cited our Supreme Court's explanation of the word "cohabit":

> Independent of the use of the word continue, the word cohabit, standing alone, connotes a fixed rather than a transient condition. The term "cohabit," says 14 C.J.S., *Cohabit*, p. 1311, "imports a dwelling together for some period of time, and does not include mere visits or journeys" . . . .

---

[11] Wife conceded that she returned to Eastridge Cove on the following dates: 9/2/05 to 9/6/05; 10/7/05 to 10/9/05; 11/18/05 to 11/27/05; 12/10/05 to 12/11/05; 12/17/05 to 1/4/06; 1/14/06 to 1/15/06; 4/6/06 to 4/8/06.

[12] Wife conceded that she stayed with Mr. Cosenza at his apartment on the following dates: 11/21/06 to 11/24/06; 12/11/06 to 1/13/07 (with the exception of four days in Mississippi, six days in a hotel, and trips to Illinois and Auburn of unspecified length).

[13] In *Honeycutt*, an MDA provided that the husband would pay to the wife weekly alimony *in futuro* until the occurrence of certain events, including "until such time as Wife . . . cohabitates with a man not related to her." 152 S.W.3d at 558. In *Honeycutt,* we noted that Tennessee Code Annotated section 36-5-121(f)(2) (formerly Tennessee Code Annotated section 36-5-101(a)(3)(A) and (B)), which creates a rebuttable presumption that a current alimony award is no longer needed when a recipient of alimony *in futuro* lives with a third person, was inapplicable because the MDA explicitly provided for the termination of alimony upon such occurrence, rather than merely creating a rebuttable presumption. *Id.* at 564 n.5. Despite finding that the statute did not apply, we nonetheless relied on cases applying the statute to determine whether cohabitation occurred. Therefore, we find it proper to rely on cases considering whether a party "live[d] with a third person" for purposes of the statute, to determine whether a party cohabitated in violation of an MDA.

*Id.* (quoting *Jones v. State*, 184 S.W.2d 167, 169 (Tenn. 1944)).

On appeal, Husband cites the case of *Azbill v. Azbill*, 661 S.W.2d 682 (Tenn. Ct. App. 1983) in support of his position that Wife and Mr. Cosenza cohabitated. In *Azbill*, this Court affirmed the trial court's finding that the wife was "liv[ing] with a third person" where the third party was at her home "daily, had a key, came in and out as he pleased, had clothes and toilet articles in the house, and at least on four different occasions spent the entire night in the home." *Id.* at 686. However, we must note that this Court's decision in *Azbill* was not based merely on four nights spent together. Instead, this Court gave great deference to the trial court's credibility determinations. Before the trial court, both wife and the third party testified that the third party male never spent the night at the wife's home and never kept toiletries or clothing there. *Id.* at 686-87. Yet, a private investigator hired by the husband testified that he observed the wife's home for four nights and found that the third party spent each of those four nights there. *Id.* at 685. Likewise, the private investigator testified that when he entered the home, he noticed both men's toiletries and clothing. *Id.* Additionally, evidence was introduced that the third party listed the wife's address as his own on his driver's license and three years' tax returns. *Id.* Evidence further showed that the third party did not maintain a telephone at his home and that his past utility bills were "very small." *Id.* Finding that the conflicting testimony required a determination of witness credibility, this Court deferred to the trial court's ruling absent compelling evidence to the contrary. *Id.* at 687.

Finally, in *McCullough v. McCullough*, No. 01A01-9701-CV-00039, 1997 WL 749459, at *4 (Tenn. Ct. App. W.S. Dec. 5, 1997), we found no cohabitation warranting a modification of alimony where uncontradictory evidence showed that an unrelated male stayed overnight with the wife only "sporadic[ally]," "anywhere from zero to five nights in any given week." In so finding, we noted that the male maintained his own residence, and no evidence was introduced that the male "kept clothing or toiletries at [the wife's] home, that he had a key to the home, or that he routinely ate his meals at [the wife's] home." *Id.* at *4.

In the instant case, we agree with the trial court's ruling that "[t]he conduct of [Wife] did not amount to cohabitation with a third-party male to whom she was not related[.]" The evidence before the trial court revealed the following: 1) Wife and Mr. Cosenza stayed overnight together "on rare occasion" at Mr. Cosenza's apartment from May 2003 to August 2005; 2) Wife returned to Eastridge Cove where Mr. Cosenza was residing for approximately 44 days during the nine-month period of September 2005 to May 2006; 3) Wife stayed at Mr. Cosenza's apartment for approximately 24 days during a seven and a half week break from late-November 2006 to mid-January 2007; and 4) Wife and Mr. Cosenza shared a bed approximately 64 nights on trips during the course of four and a half years. Importantly, we note that the trial court found both Wife and Mr. Cosenza to be credible witnesses. We also note that Husband failed to introduce evidence contradicting Wife's testimony that she and Mr. Cosenza did not share a bedroom during her return visits to Eastridge Cove. Likewise, Husband did not introduce evidence, with the exception of Mr. Cosenza's renting a portion of Eastridge Cove, that Wife and Mr. Cosenza kept toiletries or clothing at each others' residences,

that either had keys to the others' residence,[14] or that the two shared household expenses.[15]  In support of his contention that Wife and Mr. Cosenza resided together at Eastridge Cove during the summer of 2006, Husband offered proof that Mr. Cosenza failed to change his address, with the post office and certain companies, from Eastridge Cove to his new address until October of 2006. However, because Eastridge Cove was sold in August of 2006, such failure to change his address certainly did not evidence his living at Eastridge Cove beyond August 2006; therefore, we cannot find that it evidences his living beyond approximately May 13, 2006–the date of Mr. Cosenza's lease at the Arbors of River Oaks Apartments.  After reviewing the record, we find that rather than showing that Wife and Mr. Cosenza shared a "'common place of abode[,]'" *McCullough*, 1997 WL 749459, at *4 (quoting *Binkley v. Binkley*, No. 88-148-II, 1988 WL 97231, at *2 (Tenn. Ct. App. M.S. Sept. 23, 1988)), the evidence suggested only a "transient condition" including "mere visits or journeys[.]"  *Honeycutt*, 152 S.W.3d at 566 (quoting *Jones v. State*, 184 S.W.2d 167, 169 (Tenn. 1944)).

### B.    *Material and Substantial Change of Circumstances*

Next, Husband argues that even if Wife and Mr. Cosenza did not "tak[e] up residence" together in violation of the MDA, Husband's alimony obligation should nonetheless be modified due to a substantial and material change of circumstances.  Husband claims such changes include: 1) Wife's "mov[ing] her paramour . . . into the former marital residence for at least a year, during which time . . . he furnished her with additional support of no less than $1,050.00 per month; 2) Wife's using her alimony to pay for her education beyond the period which Husband was obligated to pay for such; and 3) Wife's using her alimony to pay for the expenses of the parties' grown children.

In her Affidavit of Income and Expenses, dated April 30, 2007, Wife listed a net monthly income of $6,154.67, and total monthly expenses of $8,220.00.  Of these expenses, $2852.00 was for Wife's education and expenses of the children–leaving a monthly deficit of ($2,075.33).  In her Revised Affidavit, dated October 22, 2007, Wife again listed a net monthly income of $6,154.67, but amended her monthly expenses to $7,508.00.  Of these expenses, $2,104.00 were for Wife's education and expenses of the children–leaving a monthly deficit of ($1,353.33).

Husband contends that if Wife added the $1,050.00 that she received as rent from Mr. Cosenza during the months of August 2005 to May 2006, and subtracted her education expenses and the expenses paid on behalf of her children, Wife would have a surplus of $3,000 per month during

---

[14] Husband points out that Wife was authorized to have a key to Mr. Cosenza's apartment at The Vineyard; however, Mr. Cosenza testified that such authorization only allowed Wife to obtain a key if she "needed to get in [to his] apartment."  Furthermore, Wife testified that she has never had a key to any of Mr. Cosenza's residences.

[15] Husband argues that Wife supported Mr. Cosenza by paying the mortgage, the utilities, and the homeowner's insurance on Eastridge Cove during the period that Mr. Cosenza resided there.  Because it is customary for a landlord to cover these expenses with rental income, we dismiss Husband's contention.

the period she received rent from Mr. Cosenza and a surplus of $2,000 per month even after his rental payments ceased.[16]  Therefore, he argues that Wife's alimony should be terminated as of August 2005, or alternatively that her alimony should be reduced to $4,000 per month for the period of August 2005 to May 2006 and to no more than $5,000 per month from June 2006 through December 2007.

Tennessee Code Annotated section 36-5-121(e)(2) provides, in part, that "[a]n award of rehabilitative alimony shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of substantial and material change in circumstances."  Our Supreme Court, in *Bogan v. Bogan*, 60 S.W.3d 721 (Tenn. 2001), explained:

> [A] change in circumstances is considered to be "material" when the change (1) "occurred since the entry of the divorce decree ordering the payment of alimony" *Watters* [*v. Watters*,] 22 S.W.3d [817,] 821, and (2) was not "anticipated or [within] the contemplation of the parties at the time they entered into the property settlement agreement[.]" [*I*]*d.; see also McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992); *Elliot v. Elliot*, 825 S.W.2d 87, 90 (Tenn. Ct. App. 1991).  Morever, a change in circumstances is considered to be "substantial" when it significantly affects either the obligor's ability to pay or the obligee's need for support.  *See Bowman v. Bowman*, 836 S.W.2d 563, 568 (Tenn. Ct. App. 1991).

*Bogan*, 60 S.W.3d at 728.

As the party seeking relief on the grounds of a substantial and material change of circumstances, Husband bears the burden of proving such changed circumstances warranting termination or a reduction in the amount of his alimony obligation.  ***Watters***, 22 S.W.3d at 821 (citing *Seal v. Seal*, 802 S.W.2d 617, 620 (Tenn. Ct. App. 1990)).  Once the party seeking the relief proves such grounds, the court should then "weigh the same criteria that were considered in making the initial alimony award." ***McCullough***, 1997 WL 749459, at *4 (citations omitted).  These factors are enumerated in Tennessee Code Annotated section 36-5-121(i).  "'Whether there has been a sufficient showing of a substantial and material change of circumstances is in the sound discretion of the trial court.'" ***Watters***, 22 S.W.3d at 821 (quoting *Wilkinson v. Wilkinson*, Shelby Law No. 69, 1990 WL 95571, at *4 (Tenn. Ct. App. W.S. July 12, 1990)).

---

[16]  These surplus calculations include in Wife's net monthly income, her monthly graduate assistant stipend of $1,250, which ended on May 15, 2007.

We first address Husband's contention that Wife's monthly receipt of $1,050.00 rent from Mr. Cosenza during a nine-month period constituted additional income sufficient to warrant a modification of alimony. Husband is correct that during the period of August 2005 to May 2006, Mr. Cosenza paid Wife $1,050.00 per month to live at Eastridge Cove. However, the record reveals that during that same period, a mortgage existed on Eastridge Cove which Wife paid, presumably with the rental income from Mr. Cosenza. Wife was not simply "pocketing" the rental income, but it appears she used the rental income to pay her mortgage and used her alimony to pay her rent in Auburn. Thus, Wife's temporary rental expenses offset her temporary rental income. Because Wife's receipt of Mr. Cosenza's rent did not increase Wife's disposable income, we find that such income is not a substantial and material change of circumstances warranting a modification of alimony.

Next we address Husband's claim that because Wife used her alimony to cover her educational expenses–which Husband was no longer required to pay–that Wife should be compelled to reimburse Husband for such educational expenses. Husband maintains that "[i]t was . . . not contemplated that [he] would continue to pay for [] Wife's education beyond the extent that he expressly obligated himself to do in the [MDA.]" We find Husband's claim without merit. The parties' MDA provided under the heading "Temporary and Rehabilitative Alimony," that Husband would provide certain monthly support to Wife through December 2009. It further provided that "[a]s additional support for Wife," Husband would pay certain educational expenses for Wife, including the expense of an undergraduate education at Christian Brothers University "so long as Wife remain[ed] enrolled as a full-time student . . . in an undergraduate educational program designed to result in the award of a baccalaureate or lesser degree in or before the summer of 2004," and the expense of a law degree from the University of Memphis if Wife enrolled in a "post graduate program designed to result in the award of a Juris Doctor degree in or before May of 2007." The MDA clearly stated that "Husband's obligation to fund Wife's education shall not extend beyond the conclusion of the spring semester of 2007." Based on this language, Husband argues that Wife should not have been permitted to use funds from her monthly alimony support to fund her education beyond the spring of 2007. However, Husband overlooks additional language in the MDA which provides:

> In the event Wife does not gain acceptance to law school, Husband will pay the expenses, as set forth above and subject to the same limitations, for whatever other educational program Wife chooses to pursue in lieu of law school, up to and through the end of the spring term of 2007, provided the same is calculated to result in the award of a post-graduate or other certification, *regardless of whether said degree or certification is awarded after the Spring term of 2007*. (emphasis added).

From the foregoing language, it is clear that when the parties entered into the MDA, they contemplated that Wife might continue to pursue her education beyond the period in which Husband was required to provide "additional support" for such. Therefore, we find that it was within the parties' contemplation that Wife would be required to fund her education from the income she received, including her monthly alimony payment from Husband. As such, Wife's using her monthly

-13-

alimony payment to fund her educational expenses was not a substantial and material change of circumstances warranting a modification of alimony.

Finally, we address Husband's claim that Wife should be required to reimburse him for the alimony she used for the benefit of the parties' grown children, as Husband was no longer required to support them. Wife contends that the monies used to benefit the children were paid from her "accumulated funds" rather than from her alimony. In support of this contention, Wife points out that in her original affidavit of income and expenses her net monthly income was ($2,075.33),[17] while the amount expended for her children was only $1,987.00. Likewise, Wife cites to her revised affidavit of income and expenses showing her net monthly income was ($1,353.00), while the amount expended for her children was only $1,239.00. Wife claims that because the amounts spent from her accumulated funds were greater than the amounts spent on her children, the accumulated funds, rather than the alimony, were used for the children. Because Husband has failed to introduce evidence showing that Wife used her alimony payments towards the expenses of the parties' children, we find that the evidence does not establish a substantial and material change of circumstances warranting modification.[18]

### C. Motions to Re-Open and Supplement and for a New Trial

Finally, Husband argues that the trial court erred in denying his motions to re-open and supplement proof and for a new trial. We address each argument below.

#### 1. Re-Open and Supplement

At the hearing on Husband's first motion to re-open and supplement proof, Husband claimed that while Wife attempted at trial to "minimize[] the frequency of her . . . overnight stays [with Mr. Cosenza] while she was at Auburn," newly-received credit card statements from American Express and Citibank revealed that "during the time [that Wife] was at school at Auburn she and [Mr.] Cosenza were spending almost every single weekend together, either at her and [Mr.] Cosenza's residence in Memphis, [] Wife's residence at Auburn, or at whatever hotel they were staying at

---

[17] "Net monthly income" is used to show alimony income minus expenses. Therefore, amounts shown in parentheses indicate that Wife's expenses exceeded Husband's alimony obligation.

[18] In so finding, we note that Wife's argument may not stand for the period prior to May 15, 2007, when Wife was acting as a graduate assistant. If we add Wife's $1250.00 monthly stipend to her income listed in her original affidavit and subtract her educational expenses of $865.00 from her listed expenses, we find that Wife's net monthly income was $9.47. Because the alimony she received was greater than her expenses, any payments towards the children presumably would have come from her alimony. However, Wife's original affidavit was dated April 30, 2007. Therefore, we cannot be certain of Wife's income and expenses prior to the ending of her assistantship, and Husband has offered no proof regarding such.

during one of their numerous vacations together, and every major holiday together[.]" The trial court denied Husband's motion, but allowed him to make an offer of proof. In his offer of proof, Husband alleged that the statements showed that Mr. Cosenza was in Auburn, while Wife was a student there, for approximately eighty-five days during the ten-month period of August 2005 to May 2006.[19] Additionally, he claimed that the statements showed that Wife and Mr. Cosenza took a four-day trip to California in October of 2005 and a five-day trip to Italy in March of 2006.

On appeal, Wife argues that Husband failed both at the deposition and at trial to question either Mr. Cosenza or Wife regarding any trips Mr. Cosenza made to Auburn, even after Wife listed Mr. Cosenza as an overnight visitor at Auburn in response to Husband's interrogatory. Wife maintains that Husband's failure, prior to trial, to pursue the theory that Mr. Cosenza visited Wife in Auburn should not be grounds for re-opening the proof. She also contends that Husband failed to exercise due diligence in obtaining Mr. Cosenza's credit card statements. However, Husband counters this contention by stating that Mr. Cosenza's failure to bring the required documents to his July 20, 2007 deposition necessitated Husband's subpoenaing the credit card companies, themselves, and he provides a lengthy explanation as to why this was not done until so near to trial.

"Permitting additional proof, after a party has announced that proof is closed, is within the discretion of the trial court, and unless it appears that its action in that regard has permitted injustice, its exercise of discretion will not be disturbed on appeal." ***Simpson v. Frontier Cmty. Credit Union***, 810 S.W.2d 147, 149 (Tenn. 1991) (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)). We need not address whether Husband acted with due diligence in obtaining Mr. Cosenza's credit card statements because we find that the information contained within them would not have affected the outcome of the matter. ***See Long v. Miller***, No. E2006-02237-COA-R3-CV, 2007 WL 2751663, at *9 (Tenn. Ct. App. Sept. 21, 2007) ("An erroneous exclusion of evidence requires reversal only if the evidence would have affected the outcome of the trial had it been admitted.") (citing *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. Ct. App. 1987)). After reviewing Mr. Cosenza's Citibank and American Express credit card statements, we find that the statements show, at most, that Mr. Cosenza was in Auburn for thirty-four days during the seventeen-month period of July 2005 to December 17, 2006. We cannot presume, as Husband does, that charges incurred in Fulton, Mississippi, Birmingham, Alabama, and Prattville, Alabama–approximately 225, 109, and 70 miles from Auburn, Alabama, respectively–indicate that Mr. Cosenza was visiting Wife in Auburn. Even giving Husband the benefit of days where Mr. Cosenza incurred two charges within five days of one another, without making purchases in other cities in between, we find the statements reveal merely thirty-four days, rather than eighty-five days, that Mr. Cosenza spent in Auburn. Additionally, we note that although Mr. Cosenza's statements may show that he was in California and Italy during the periods that Husband suggests, they do not indicate that Wife was accompanying

_____

[19] These dates include: 8/19/05 to 8/21/05; 8/26/05 to 8/29/05; 9/10/05; 9/15/05 to 9/21/05; 10/14/05 to 10/17/05; 10/28/05 to 10/30/05; 11/4/05 to 11/9/05; 12/2/05 to 12/10/05; 1/8/06 to 1/14/06; 1/15/06 to 1/17/06; 1/20/06 to 1/24/06; 1/27/06 to 1/30/06; 2/11/06 to 2/12/06; 2/24/06 to 2/26/06; 3/4/06 to 3/7/06; 3/11/06 to 3/17/06; 3/23/06 to 3/24/06; 4/14/06 to 4/18/06; 4/28/06 to 5/3/06.

him. We find that this evidence was insufficient to affect the trial court's determination; therefore, we find the trial court did not abuse its discretion in denying Husband's first motion to re-open and supplement proof.

In his second motion to re-open and supplement proof, Husband claimed that supplemental documentation from Regions Bank, which was received after the deadline set forth in the subpoena, provided evidence that Mr. Cosenza lived in Eastridge Cove during the summer of 2006, when Wife was also residing there. This documentation included "a checking account deposit fil[l]ed out by Robert Cosenza and dated May 23, 2006, upon which Mr. Cosenza hand wrote his address [as] . . . Eastridge Cove[,]" as well as "an additional pre-printed deposit slip presented by Mr. Cosenza on June 23, 2006,[20] which reflected, without correction, his address as the Eastridge Cove address." Finally, Husband claimed the Regions Banks documentation revealed that "every check written by Mr. Cosenza on the account during the summer of 2006 (from and after May 13, 2006, through August 2006) continues to bear, without correction, the pre-printed Eastridge Cove address." At the hearing on Husband's second motion, the trial court denied his motion as well as his request to make an offer of proof; however, included in the record is a deposit slip dated May 23, 2006, on which Mr. Cosenza hand wrote Eastridge Cove as his address, as well as a deposit slip posted on June 26, 2006, with Eastridge Cove pre-printed, and uncorrected, as Mr. Cosenza's address.[21]

Again, we find that the documentation would not have affected the trial court's determination, and therefore, that the trial court did not err in denying Husband's second motion. At the hearing on Husband's petition to modify alimony, Husband's counsel introduced a carbon copy of a check dated May 18, 2006,[22] on which Mr. Cosenza crossed out the pre-printed address and hand wrote Eastridge Cove as his address. Mr. Cosenza maintained that his actions did not mean that he was residing at Eastridge Cove at the time, but instead he explained that he "had a checkbook full of checks [he] changed addresses on because [he] was too cheap obviously to buy new checks." We do not find Mr. Cosenza's failure to correct his address on a pre-printed deposit slip necessarily indicates that he was living at Eastridge Cove at the time. Although a closer call, we likewise do not find that his affirmatively listing Eastridge Cove as his address on a blank deposit slip indicates such. Accordingly, we conclude that the trial court did not err in denying Husband's motion to re-open and supplement proof.

## 2. New Trial

---

[20] Mr. Cosenza did not date the deposit slip, but it was posted on June 26, 2006.

[21] Also included in the record is a deposit slip, bearing no address, dated August 27, 2006.

[22] The check appeared to be dated May 18, 2008; however, Mr. Cosenza testified that based on the check sequence, the correct date must have been May 18, 2006.

Finally, on appeal, Husband argues that the trial court erred in denying his motion for a new trial. Husband contends that had the trial court considered the "newly discovered evidence"–the documentation from American Express Citibank, and Regions–"it would have been constrained to find that [] Wife and [Mr.] Cosenza were in fact cohabitating, not to mention taking up residence with one another."[23]

Whether a new trial should be granted based on newly discovered evidence is within the discretion of the trial judge. *Collins v. Greene County Bank*, 916 S.W.2d 941, 945 (Tenn. Ct. App. 1995) (citing *Seay v. City of Knoxville*, 654 S.W.2d 397 (Tenn. Ct. App. 1983)). The party moving for a new trial "must demonstrate that the new evidence was not known prior to or during trial and that it could not have been ascertained by the exercise of reasonable diligence." *Id.* The trial court must also consider whether the newly discovered evidence would affect the outcome of a new trial. *Id.* (citing *Leeper v. Cook*, 688 S.W.2d 94 (Tenn. Ct. App. 1985)).

We need not consider whether Husband exercised reasonable diligence in attempting to ascertain the documentation from American Express, Citibank, and Regions Bank, because, as we noted above, such documentation would not have affected the outcome of the trial. Accordingly, we affirm the trial court's denial of Husband's Motion for a New Trial.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to Appellant, Christopher Eugene Rickman, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

---

[23] In his Motion for a New Trial, Husband alleged as an additional ground for a new trial, that "it was error for the Court to interrupt and direct the examination of Robert Cosenza by Counsel for Plaintiff at trial[, and] [t]he Court's actions effectively prevented Counsel for Plaintiff from fully and thoroughly examining Robert Cosenza at trial[.]" Husband does not raise this ground on appeal.